**S. Harvey KLEIN, Assignee for the Benefit of Creditors of Beam Radionics Corp.**

v.

**UNITED STATES.**

No. 20–56.

United States Court of Claims.

Jan. 18, 1961.

Rehearing Denied April 7, 1961.

Jones, Chief Judge, dissented in part.

James H. Heller, Washington, D. C., for plaintiff. Abraham J. Harris and Sher, Oppenheimer & Harris, Washington, D. C., on the briefs.

John F. Wolf, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

MADDEN, Judge.

This is a suit for damages for the alleged wrongful termination by the Government of a contract between the Government and the plaintiff's assignor, Beam Radionics Corporation, hereinafter called Beam. The plaintiff is the assignee for the benefit of creditors of Beam. The Government's original answer denied liability, alleged that the plaintiff had failed to exhaust his administrative remedies, and counterclaimed for alleged overpayments to Beam. By amendment to its answer, filed by leave of court, the Government pleaded fraud on the part of Beam, and added two counterclaims for statutory penalties for fraud, one counterclaim relating to the contract in suit and the other relating to another contract which Beam had with the Government.

On June 27, 1951, Beam entered into a negotiated contract with the Army Corps of Engineers for the furnishing of 1,000 electric lighting sets at prescribed prices per set and with prescribed dates for beginning and completing deliveries. The total contract price was $1,675,000. This contract was known as contract 955. Before entering into contract 955 the Government had made an investigation of Beam's ability to perform. Beam had before that time undertaken and completed a dozen or more other military supply contracts.

Beam made subcontracts for the acquisition of the parts for the electric lighting sets. It planned to itself assemble, test, package and ship the completed sets. The rubber-insulated cable which was to be a part of each set had to meet rigid contract specifications for use at very low temperatures. The Government was to test the cable at its engineering and development laboratory at Fort Belvoir, Virginia. At the time contract 955 was made, no cable meeting the contract requirements had been produced, and the Government was aware of that fact. The United States Rubber Company had been conducting research in the development of rubber-insulated cables, including cables of the type needed for contract 955. The Government's officials had informed Beam that United States Rubber's cable came closest to meeting the contract specifications.

Before contract 955 was made, Beam had made another contract, No. 7939, with the Army Corps of Engineers for the furnishing of floodlighting sets which required a somewhat similar cable. For both contracts, Beam had subcontracted the production of the cable assemblies to Brad Harrison Co., and that company had subcontracted the production of the cable itself to United States Rubber. United States Rubber submitted samples of cables to the Corps of Engineers' testing laboratory at Fort Belvoir in August and October 1951. These samples were rejected by the laboratory. Although delivery of the lighting sets was to have commenced on November 20, 1951, and although by that date not even a sample of cable meeting the contract specifications had been produced, the Government on December 4, 1951, and thereafter until the latter part of February 1952 continued to issue change orders, to make plans for inspection of finished parts, and in other ways to show that it still expected and desired performance of the contract.

A new cable sample was prepared for testing in early February 1952. Just before it was submitted, Beam officials had a conference with Mr. Krauss, a representative of the Government's contracting officer. The purpose of the conference was the discussion of Beam's other contract, No. 7939, but Krauss also said he was considering terminating contract 955, or deleting the cable from the contract. Beam's representative said Beam would be happy to be relieved of the troublesome cable problem.

A cable sample had been submitted on February 9. It passed the test for contract 7939 but not the more rigorous test for contract 955. On February 26, a new sample was submitted. Krauss was aware of this submission. The tests were made, but Krauss made no effort to learn how the tests were progressing. The official laboratory report was not issued until the middle of May.

On April 1, 1952, the contracting officer notified Beam of the termination of contract 955

"pursuant to General Provision 11, Default. The reason for this action is your failure to make delivery of the sets as you were obligated to do under the terms of your contract."

The letter also said that it constituted findings of fact from which the contractor could appeal. Beam appealed on April 10, saying it was ready to proceed with the manufacture as soon as the cable submitted for testing had been approved.

On May 21 the contracting officer sent Beam another "Findings of Fact" which said, among other things:

"Contractor has failed to supply satisfactory cable within time when delivery schedule could possibly be met. No definite subcontracts were entered into for cable."

These findings further said that Beam's available space was inadequate for the timely assembling of the lighting sets, and that Beam's financing was not sufficient for the performance of the contract.

On June 4, 1952, Beam appealed the contracting officer's decision. The Armed Services Board of Contract Appeals held a hearing in May 1953 and on October 1 decided that the Government had no right to terminate contract 955 for default. The Board held that the Government had, by its conduct, waived compliance with the delivery dates prescribed in the contract; that the Government did not prove that Beam did not have sufficient space for the timely assembly of the lighting sets; and that Beam's financial position was not different at the time of cancellation than it had been when it was investigated before the award of the contract. The Board found that the cable sample submitted on February 26 complied with the specifications of the contract.

In the course of its discussion the Board said:

"Under the circumstances of this case, we are of the opinion that the proper remedy was that of termination for the convenience of the Government, if termination was desired."

On November 27, 1953, the contracting officer wrote Beam, referring to the decision of the Armed Services Board of Contract Appeals, and saying:

"In view of said decision the Government deems the above notice of default to have been issued pursuant to Clause 21 of the contract entitled, 'Termination for the Convenience of the Government', for the complete termination thereof, which became effective as of 3 April 1952, the date of the receipt of such notice by the contractor."

The contracting officer thereby sought, a year and a half after the event, to convert the April 1, 1952, termination for default into an April 1, 1952, termination "in the best interests of the Government," commonly called "termination for the convenience of the Government." If that was effectively done, it would mean that the Government's action was not wrongful, because the contract expressly granted the Government the right to

so terminate under certain conditions. And it would mean that the Government's contractual liability to Beam would be limited to the items of compensation named in that provision of the contract (see finding 2, contract article 21(e) and (f)), and the liability would, in this and in most cases, be small.

The plaintiff, in response to the contracting officer, asserted, and in this suit asserts, that the Government did not terminate the contract for convenience, but breached it and is liable for the damages resulting from the breach.

On April 19, 1955, the Government advised Beam that it would proceed to make a unilateral determination of its liability to Beam under the contract provisions relating to termination for convenience. It did not make such a unilateral determination. On September 13, 1955, Beam assigned its assets to the plaintiff for the benefit of its creditors. On January 17, 1956, the plaintiff filed the instant suit.

■ The Government asserts, in bar of the entire claim, that Beam forfeited its rights under its contract, by corruptly practicing or attempting to practice a fraud against the United States in connection with the contract in suit. The statute relied on is 28 U.S.C. § 2514, which provides:

"A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

"In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture."

The asserted fraudulent conduct was Beam's presentation of requests for and receipt of certain partial payments during the course of the contract. The Government also bases its second counterclaim, for penalties under 41 U.S.C.A. § 119, upon these allegedly fraudulent transactions.

Beam had made a subcontract with The Branchell Co. for the production of parts for the lighting sets. Branchell was to acquire and use, and Beam was to pay for and own, the mold, tools and fixtures needed to produce these parts. Branchell sent Beam a bill for the tools and Beam requested and received a partial payment of 75 percent on the amount of Branchell's bill. At the time it received the partial payment Beam had not paid the Branchell bill. Beam also made a subcontract with Shepard Engineering Co. providing that Shepard would produce parts for the lighting sets, and would manufacture tools to make the parts. This subcontract provided that the tools were not to become the property of Beam until completion of the contract. Shepard billed Beam for the tools, though in fact, unknown to Beam, it already had the necessary tools left over from a former contract. Beam requested and received a 75-percent partial payment from the Government on the bill which Shepard had submitted, although it had not yet paid that bill. In addition, Beam requested and received partial payment based upon invoices from the Lewis Paper Products and Lorenz Engineering which had not yet been paid by Beam.

In the above instances, Beam had "incurred", or supposed that it had incurred, the liability to its subcontractors shown by the invoices. It did not have, and was not supposed to have, possession of the tools covered by the invoices. Nor did the contract require that the invoice be paid before the contractor could receive partial payment thereon. The contract, in the article governing partial payments, provided only that:

"(a) The Contracting Officer may, from time to time authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: * * *.

"(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or

produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production:

\* \* \*."

The defendant argues that Beam was required to have acquired, that is, to have in its possession, any items for which it requested partial payment. It says that the requirement of paragraph (b), quoted above, that title to property acquired by Beam must vest in the Government, was violated when Beam secured partial payment for property which Beam had not yet acquired, since title to such property could not vest in the Government. But paragraph (b) expressly recognizes that partial payment might be made to Beam before it acquired property. It says that title to property acquired by Beam *after* partial payment was to vest in the Government upon such acquisition. The fact that Beam requested partial payment before it had paid its subcontractors, or that, having received the partial payments from the Government, it did not promptly pay its subcontractors, did not violate the contract, and was not a fraud upon the Government. There was no fraud and therefore no basis for forfeiture of the plaintiff's rights under the contract in suit under the provisions of 28 U.S.C. § 2514.

■ The Government urges that Beam failed to exhaust its administrative remedies. It says that Beam failed to appeal the contracting officer's settlement offer, which it says was a determination of the amount which Beam should receive on account of the termination of the contract. This contention has no merit. The Government, on April 19, 1955, advised Beam that it would proceed to make a unilateral determination, and would proceed to gather the records and make the audits necessary for that purpose. It never made the unilateral determination. There was no determination which the plaintiff could have appealed to the head of the department, even if we assume that there was a termination "for the convenience of the Government."

■ We must now determine whether there was a termination for the convenience of the Government, as the Government asserts, or a breach of contract, as the plaintiff asserts. The difference is vital, particularly with regard to the measure of damages.

Article 21 of the contract, quoted in finding 2, says, in paragraph (a):

"The performance of work under this contract may be terminated by the Government \* \* \* whenever the Contracting Officer shall determine that such termination is in the best interests of the Government."

The contracting officer, in fact, terminated the contract, on April 1, 1952, expressly for inexcusable default in performance by Beam. Not until November 27, 1953, did he put his mind on the question of whether it was "in the best interests of the Government" to have done so. By that time the Board of Contract Appeals had decided that Beam had been diligent in the performance of the contract; that delay in performance had been unavoidable and had been waived by the contracting officer; that Beam did not lack space for performing the contract; and that Beam's financial capacity was substantially as good when the contract was terminated as it had been when that capacity was investigated before Beam was awarded the contract. If we put the contracting officer back in the situation that he faced on April 1, 1952, with the benefit of the corrections made by the Appeals Board, he would also have had to consider some additional facts. He would, "in the best interests of the Government," have had to consider when the Government would be likely to get the needed lighting sets if he should cancel Beam's contract. In

so doing he would have had to bear in mind (1) that Beam had already let sub-contracts; (2) that the United States Rubber Company, the most promising prospect for producing a satisfactory cable for the lighting sets, had been working on the cable problem for months and was producing samples which were nearing success; and (3) that on February 26, 1952, a sample of the cable had been submitted for testing and the test results had been available to the contracting officer prior to April 1, 1952. The question for the contracting officer would, to say the least, have been a difficult one.

The Board of Contract Appeals in its opinion quotes one of the Government witnesses before the Board as saying that if the cable had been satisfactory

"it is quite probable that no—the contract would not have been defaulted, because there would have been a possibility of the contract being completed."

To determine what the contracting officer would have done on April 1, 1952, if he had then known what he knew on November 27, 1953, would require pure speculation on our part. In fact, it seems that the termination was not in the best interests of the Government, since deliveries under the repurchase contracts were almost a year later than the dates agreed upon in those contracts.

The Government points, however, to paragraph 11(e) of the contract, which provides:

"(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault of negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled 'Termination for Convenience of the Government,' and the rights and obligations of the parties hereto shall in such event be governed by such clause."

This paragraph, by its terms, applies only when there has been a failure to perform which is found to be excusable. Compare Telco Electronics Co., A.S.B. C.A., No. 724, p. 23, 5 C.C.F. ¶ 61,294, p. 51,923 (1951). In this case, such failure to perform was not found. It would be anomalous indeed if the Government were entitled to breach its contract at will, and then escape the penalty for its breach by retroactively invoking a termination for convenience.

The Government relies on the case of College Point Boat Corporation v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490, affirming 58 Ct.Cl. 380. In that case the Supreme Court held that the Act of June 15, 1917, 40 Stat. 182, as construed in Russell Motor Car Co. v. United States, 261 U.S. 514, 43 S.Ct. 428, 67 L.Ed. 778, gave to the President the unqualified and absolute right to cancel contracts for the building of ships. The statute provided that if a contract was canceled, just compensation should be made, as determined by the President, and that if the contractor was not satisfied with the President's award, he could accept 75 percent of it and bring suit for such additional sum as would, when added to the amount received, constitute *just compensation.*

In the case before us, the Government had no such right to cancel the contract as it had under the 1917 statute. Its rights to terminate for default, or for the convenience of the Government, were expressly defined in the contract. The contract provision hereinabove quoted expressly provided that if the contractor was in default, and the contract was terminated for that default, and it was later determined that the default was excusable, the termination could be treated as a termination for the convenience of the Government. In the instant case the contractor *was not in default.* That was found by the Board of Contract Appeals, and its finding was well supported by evidence. The Government had, by its

words and its conduct, extended the time for the performance of the contract, and until that extended time had elapsed, the contractor was no more in default than he was on the first day after the contract was made.

When one makes a contract with the Government, he of course takes the risk that the provisions of the contract, worked out by the Government in its long experience in the writing and administration of contracts, may work to his disadvantage. But he does not, merely by signing a contract with the Government, award it a license to twist and warp one of the exculpatory provisions which it has written into the contract, and make it apply to a situation not covered by the provision as written. If the Government desires to do what the 1917 shipbuilding statute did, i. e., reserve the unqualified right to cancel contracts, and agree to pay just compensation for their cancellation, let it say so, as it did in 1917. In the instant case it did not reserve such a right to cancel, and, by the law of contracts, it had, in the circumstances, no more right to cancel than does any party to any contract.

The case has no resemblance to that of one who has terminated a contract for a stated reason, which turns out to be insupportable, but later discovers and relies on a valid reason for cancellation. In the instant case no valid reason for termination has ever been presented by the Government.

The *obiter* statement of the Board of Contract Appeals that "the proper remedy was that of termination for the convenience of the Government, if termination was desired" is not entitled to weight. No such contention was made to the Board by either party, and it would be wholly unfair to the Board to saddle it with the responsibility for a decision which is obviously wrong.

The Government cites this court's opinion in The Commonwealth Engineering Co. of Ohio v. United States, Ct.Cl., 180 F.Supp. 396. In that case the plaintiff had entered into a termination agreement, but later sued the Government asserting that the agreement was invalid because the Government had used duress in obtaining the plaintiff's consent to the agreement. The court held (1) that if the plaintiff was in fact in default, it was not duress for the Government to threaten to terminate the contract for default if the plaintiff would not sign the tendered termination agreement and (2) that if the plaintiff was, as it alleged, not in default, the Government still had the right to terminate for convenience of the Government, under either article 11(e) or article 21(a) of the contract.

It will be observed that in Commonwealth Engineering the contracting officer terminated the contract for the convenience of the Government. He did not, as in the instant case, terminate it for another reason, and, more than a year later, attempt to place the termination on another ground more advantageous to the Government. Further, in the circumstances of that case, the contracting officer had the right, under article 21(a) of the contract, which had nothing to do with default, to terminate the contract for the convenience of the Government, and could do so in good faith in view of the status of performance of the contract.

This court's alternative observation that even if the contractor was not in default, the Government could terminate the contract for its convenience under article 11(e) of that contract, which was identical with article 11(e) of the plaintiff's contract, was, we think, erroneous. It would mean that the Government has an unqualified right to terminate every contract which contains a provision like that in article 11(e) and would impose upon contractors with the Government a risk which their contracts do not contemplate. This observation in Commonwealth Engineering was not necessary to the decision of the case.

Our conclusion is that the Government, having wrongfully terminated Beam's contract, could not retroactively give that wrongful termination a different legal

effect by changing the label which had been expressly and purposely attached to it when the termination occurred. The only purpose of the change of label was to diminish the amount of the damages which Beam might recover. That kind of saving is not what the contract contemplated in its words "in the best interests of the Government."

The plaintiff is entitled to recover the damages caused to Beam by the wrongful termination of Beam's contract. As in all such cases no exact computations can be made as to what the contractor's costs would have been if it had been permitted to perform the contract, and what profit it would have made. The plaintiff contends that he is entitled to recover $272,629.60, including $219,334.-28 for lost profits. He argues that Beam would have incurred costs totaling $1,-455,665.72 in performing contract 955, for which the contract price was $1,675,-000. The costs as projected by the plaintiff include $1,192,263.29 in estimated costs of subcontracts, as indicated by prices included in purchase orders on all but two of the subcontracts. For the two subcontracts for which the purchase orders contained no price, the plaintiff estimated prices totaling $600,795. In addition to subcontract costs, the plaintiff included other costs totaling $263,-402.43, representing estimated packaging, labor, overhead, freight, shrinkage and general and administrative expenses. We cannot calculate with any pretense of exactitude the costs which the plaintiff would have incurred, and in view of the various uncertain aspects in at least $860,000 of the costs as presented by the plaintiff, we think that, under the circumstances, $1,495,000 represents a reasonable estimate of the plaintiff's costs. This yields a profit loss of $180,000.

We conclude, therefore, that the plaintiff's recoverable damages are $180,000 in lost profit and $69,347.33 in costs, or a total of $249,347.33. Partial payments made by the defendant totaled $16,052.-01, so the plaintiff is entitled to recover $233,295.32.

The Government urges that some of the findings of the Board of Contract Appeals were not supported by substantial evidence, and that it may, under the Wunderlich Act, 41 U.S.C.A. § 321, and upon the basis of this court's decision in Volentine & Littleton v. United States, 145 F.Supp. 952, 136 Ct.Cl. 638, attack them. We assume, without deciding, that the Government is as free as its adversary to resort to the statute, and to the judicial doctrine referred to. But we do not find that any of the Board's findings were not supported by substantial evidence, even when the evidence produced at the trial in this court, and which the Board did not have before it, is placed upon the scale. The only item which seems questionable to us is the Board's finding that the cable sample submitted on February 26, 1952, complied with the specifications of the contract. At the hearing before the Board, this fact was testified to by Mr. Krauss and was conceded by Government counsel. In the trial before the commissioner of this court, the Government presented laboratory tests and the testimony of laboratory technicians tending to show that while the February 26 sample complied with the low temperature test, it failed to meet other requirements and was not acceptable. It will be remembered that the problem which had seemed almost insoluble was the low temperature problem. When that was solved, it would seem that success was at hand. This occurred in 1952. The trial before the Board was in 1953, and the evidence was that the test was successful. But in 1957 and 1958, in the hearing before our commissioner, although Krauss again testified that the sample had been approved, the Government's technician testified that there were defects in the sample not relating to low temperature. It would seem that when any object is subjected to a severe laboratory test it will be found to be in some respect less than perfect. Whether the imperfections pointed out years after the tests would have been regarded by the Board as material, we do not know. In this situation,

we do not find that the Board's finding was not supported by substantial evidence.

## The Defendant's Third Counterclaim

 As appears earlier in this opinion, Beam had another contract with the Government, contract 7939, which was in the course of performance during the events relating to contract 955 on which the plaintiff sues. In connection with contract 7939, Beam awarded a subcontract to Murakami and Sons, Inc. for the furnishing by Murakami of the chests for the floodlights which were the subject of contract 7939. The subcontract price was $29.50 per chest. Thereafter an agent of Beam increased the subcontract price to $69.50 per chest. Murakami billed Beam for $34,750 for 500 chests at $69.50 per chest. Beam presented this invoice to the Government and received a partial payment of $26,-062.50, i. e., 75 percent of the amount of the invoice. Ultimately Beam paid Murakami only $29.50 apiece for the chests. At that price, Murakami's bill to Beam would have been $14,750, and a partial payment of 75 percent thereof would have been $11,062.50.

Contract 7939 was completed by Beam and Beam was paid the contract price by the Government. The Murakami manoeuvre resulted in no loss to the Government except the loss of the use of the excess $15,000 of partial payment money for the short period between the time of partial payment and the time the excess was recouped by the Government.

The False Claims Act, 31 U.S.C.A. § 231, provides that anyone knowingly making a false claim against the United States should forfeit and pay to the United States the sum of $2,000, and double the amount of damages sustained by the United States by reason of the false claim. Evidence of fraud must be clear and convincing. While it does appear that the Murakami invoices were padded, the purpose of the padding was not proved. The testimony of the witness Murakami was so confused that it is unintelligible. A finding of fraud or of a false claim within the meaning of the statute could not possibly be based upon it.

Defendant also alleged fraud in connection with Beam's receipt of partial payment based on an invoice from Harrison Iron Works, which invoice was not paid by Beam, and was canceled by Harrison after partial payment had been made. It appears from the evidence that a salesman of Beam's had been aware that Harrison expected advance payment for the items covered by its invoice, but it is not shown that Beam officials had any knowledge of this problem, which eventually led to cancellation of the purchase order to Harrison. There is no evidence that the Harrison invoice was fraudulently presented in order to obtain partial payment, and Beam's failure to return that payment after cancellation of the Harrison order does not constitute fraud. Beam did not conceal the cancellation, and the Government was free to deduct the amount of partial payment from future payments to Beam, as it saw fit. The amount of partial payment involved was $1,886.25.

Although no fraud has been shown to have been involved in the Murakami transaction, Beam's actions did result in securing a payment from the Government to which it was not entitled under the contract. As a result, the Government lost the use of $15,000 for a period of nine months. The Government is therefore entitled to recover interest at the rate of 6% per annum on that amount, or a total of $675, on its third counterclaim. The Government's first and second counterclaims will be dismissed.

The plaintiff is entitled to recover $233,295.32 for the breach of its contract. Therefore, the plaintiff's net recovery will be $232,620.32 and judgment will be entered in that amount.

It is so ordered.

LARAMORE and DURFEE, Judges, concur.

WHITAKER, Judge, took no part in the consideration and decision of this case.

JONES, Chief Judge (dissenting in part).

The contract involved here was experimental in nature. Both Beam and defendant understood this. The requirements of Contract 955 included a certain type of rubber cable. It was necessary that the cable meet rigid tests. Neither party knew whether such a cable could be produced. Beam was willing to undertake it. The Government gave Beam four different chances to produce such a cable. Each cable failed to meet the test. Shortly thereafter the contracting officer terminated the contract for default.

On June 4, 1952, Beam appealed the contracting officer's termination of Contract 955. The Armed Services Board of Contract Appeals held a hearing in May 1953, and on October 1, decided that the evidence did not justify burdening appellant with the liabilities of a default. At most, said the Board, the evidence would justify only a termination for convenience.

"Under the circumstances of this case, we are of the opinion that the proper remedy was that of termination for the convenience of the Government, if termination was desired. * * * Appellant's failure to live up to contract time of performance was quite obviously the result of the awaiting of tests, in which delay the Government was active in participating and which it accepted as an incident of performance. It was an excusable delay, and should not subject appellant to the liability of a default * * *." [Finding 28.]

The liabilities the Board sought to obviate were the damages the Government might sustain in entering repurchase contracts. In fact, the Government entered into two repurchase contracts for the procurement of the electric lighting sets originally covered by Contract 955 at no additional cost.

Shortly after the Board decision, Beam's counsel requested of the contracting officer various forms prescribed for filing termination claims under contract section 21, "Termination for Convenience of the Government." The contracting officer responded with the forms and stated in reference to the Board decision as follows:

"In view of said decision the Government deems the above notice of default to have been issued pursuant to Clause 21 of the contract entitled, 'Termination for the Convenience of the Government,' * * *."

Thereafter, counsel for Beam stated his belief that "the contractor is not limited to the rights specified in said clause entitled 'Termination for Convenience of the Government', and that the *notice of termination constituted a breach of the contract* for which the contractor is entitled to recover damages, which would apparently be in excess of the amounts payable under the 'Termination for Convenience of the Government' clause." [Emphasis supplied.]

Subsequently, this suit was filed, with the plaintiff claiming all of Beam's costs plus the expected profit on the *entire* contract. The plaintiff bases this claim on the position that the Government should not be allowed to change the designation of a termination from one for default to one for the convenience of the Government.

In these circumstances, with a contract as uncertain of performance as the one involved in this suit, to permit a recovery of $180,000 in wholly speculative profits cannot be justified. I am convinced, however, that the plaintiff should be allowed to recover the costs and pro rata profits which would have been allowed had the Government originally assigned the proper designation to the termination of the contract.

This case ought not be considered as an ordinary breach of contract situation with but an added twist—the Government trying to avoid paying damages by converting a frank breach of contract

into a termination for convenience. An original assumption that there has been a breach of contract by the Government only serves to becloud critical consideration of the issues and is improper. In this case, if the Government had *any right to terminate,* any right by whatever designation to issue a termination order, there has been no breach at all. Possibly there has been a procedural error, but such error should not have the effect of a breach of contract.

I conceive this case as being roughly analogous to one where a party in suit proves less, or more, than it alleged and tries to amend its pleadings to conform to the proof. Here, the Government failed before the Contract Appeals Board to prove an inexcusable default by the contractor, but it appears the Government did establish grounds for terminating the contract for convenience. Thereupon, the Government amended the termination notice from "default" to "convenience of the Government."

For example, if a vendee, obligated under a valid sales contract, refuses tender of the goods stating incorrectly that the proper delivery date has passed, apparently the vendee has breached his contract. But if, thereafter, he proves that the goods irreparably failed to meet the contract specifications, there is little doubt that he has a valid defense against suit. It is the refusal of the tender, an act which the vendor claims was wrongful, for which he brings suit. If the vendee had any valid reason for his refusal of the tender, even if he stated the wrong reason in the beginning, he will avoid a judgment of damages, providing only that the vendor has not been misled to his detriment by the original reason assigned to the refusal of tender. According to Professor Williston, "To hold, as a broad proposition, that stating one reason for refusing to accept tendered performance precludes a promisor from later stating another reason * * * seems almost grotesque." This case should be judged by similar principles.

Certainly, it would be outrageous if the Government could escape paying damages for failing to perform its own contractual obligations by retroactively antedating any such misconduct with a termination order—"for the convenience of the Government." For example, if the Government failed to deliver material which it had contracted to furnish on March 1, it could not properly issue on April 1, a termination order antedated February 1. That kind of governmental convenience would be beyond the contemplation of the parties to the contract.

In this case, however, the plaintiff claims that the breach of contract was the issuance of the termination order, not some other act, before which the Government is trying to insert a termination order. Plaintiff is correct if the termination could only be substantiated on a finding of unjustifiable default. But if the Government, in the first instance, had a right to terminate the contract under *any* designation, then I fail to see that there has been a breach at all. The Government then did what it had a right to do, *terminate,* although it gave the wrong reason. Furthermore, if the plaintiff was injured by the delay in properly designating the termination, it may recover in the final settlement provided in the "Termination for Convenience of the Government" section of the contract. It is not entitled, however, to all its expected profits on the entire contract.

There are few precedents in the field to guide the court. One Supreme Court case is in point. In College Point Boat Corp. v. United States, 1925, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490, affirming this court, Justice Brandeis stated that the Government had an unconditional right to cancel the contract in suit even though the Government itself had clearly breached the contract, and notwithstanding the plaintiff was already in this court suing the Government for its breach. The court's opinion in the case before us points out that the cancellation in College Point was permitted by a special statute then in force, whereas in this case, all the parties' rights must be derived from the contract provisions them-

selves. While I agree here with the majority opinion, I do not believe that the Government's rights under this contract are much inferior to those it had under the College Point statute. The contract here gave the Government a broad right to terminate, not wholly unconditional, a right which might be exercised only for the best interests of the United States. But absent proof of fraud or caprice, I believe the contracting officer's judgment of the best interests of the United States *vis a vis* the contract ought to be conclusive.

A diligent search has failed to uncover any significant statute, regulation, or even case discussion of what criteria a contracting officer must consider in determining when termination of a contract is in the best interests of the Government. It is reasonable to assume that such criteria might include the technical progress made by the contractor in the research and development phases of the work, current and future availability of financing, current labor-management relations, continued need for the equipment —either greater or less than when the contract was let, availability of alternative producers, and estimated production and delivery dates when it appears that the contract dates cannot be met.

We know the contractor was experiencing serious difficulty in obtaining the required rubber cable. The trial commissioner who heard the evidence and saw the witnesses face to face, saw fit to quote in finding 28 portions of the opinion of the Armed Services Board of Contract Appeals. The trial commissioner followed the quotation with this sentence:

"Some of the findings or determinations of the ASBCA were not supported by substantial evidence."

The trial commissioner also added this footnote:

"(1) On February 26, 1952, Beam submitted its fourth cable sample to ERDL to be tested. This cable was tested by ERDL after termination of Contract 955. It passed some of the requirements of the specifications but did not meet the physical requirements. Testimony before the Board on this point was incorrect, contrary to the facts. Beam contended and defendant's counsel at the time and a witness admitted that the cable had met the requirements of Contract 955. However, laboratory reports now in evidence, and testimony during the trial by the laboratory technician who made the tests, reveal that while the cable passed the low-temperature test, it failed to meet other physical requirements and was not acceptable."

The trial commissioner found, and I agree, that even the fourth cable sample submitted by Beam failed to meet the contract specifications and was unacceptable. The majority has seen fit to eliminate the above-quoted sentence and footnote and substitute a finding that all of the Board's findings were supported by substantial evidence. I would restore the trial commissioner's findings.

At best, the degree of rubber cable development is a disputed point. Besides the rubber problems, Beam was still handicapped by his inability to improve his financial position and was further hampered by a lack of production space. It was extremely doubtful that Beam could ever have performed the contract. Surely all must agree that the Government was not obliged to let the development and production drag on indefinitely. Considering all of this, the contracting officer, whatever other criteria he may have used, might with all justification have concluded that quicker results would be obtained with another contractor.

The determination of convenience of the Government is primarily one for the contracting officer and the administrative agency. In this case, I am unwilling to contradict the determination as made for I see nothing arbitrary or unjust in the result. Therefore, it is my conclusion that the Government had grounds for terminating the contract for convenience when it first issued the termination

order, and should be permitted to amend the order to read "Termination for Convenience of the Government." But in doing so it must pay any damage that may have been caused by the delay in assigning the proper reason for the termination.

There is another reason why I must dissent from the decision of the court. I believe that Beam did default its contract and that the plaintiff is trying to recover here by side-stepping the express provisions of the contract.

Section 11 of the contract entitled "Default" describes default procedures in detail, as follows:

"(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform services within the time specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, * * *."

Subsection (b) provides for circumstances where nonperformance is excused and protects the contractor from liability for "excess cost if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor." Expressly included among these uncontrollable causes are "acts of the Government."

These sections are clear and uncontroverted. The dispute centers on the application of subsection 11(e), which provides:

"If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, *such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled "Termination for Convenience of the Government,"* and the rights and obligations of the parties hereto shall in such event be governed by such clause. * * *" [Emphasis supplied.]

This paragraph, by its terms, applies only when there has been a failure to perform which is found to be excusable.

I believe it manifest from the facts of this case that Beam did fail to perform the contract. Beam agreed to deliver 500 electric lighting equipment sets commencing on or before November 20, 1951. Delivery was to be completed by February 21, 1952, yet as of April 3, 1952, none of the sets had been produced, and of course none delivered. The primary cause of Beam's failure to perform was the unavailability of rubber cable sufficient in quality to meet the contract specifications. Beam knew in the beginning of the risks inherent in the contract, for a new low-temperature rubber had to be developed if the contract requirements would be met. To this end, Beam subcontracted the rubber production to one of America's largest rubber manufacturers. Nevertheless, delivery dates came and passed with no suitable rubber produced and no lighting sets assembled. Various change orders were issued from time to time modifying the technical specifications of the sets to be manufactured, but Beam never received an extension of delivery schedule by contract modification.

I accept the Board's determination that Beam's failure to deliver the sets resulted in part from the Government's delay in testing the rubber samples. The Board was properly concerned lest Beam be burdened with the drastic liabilities of a default. I agree that Beam's delay was excusable, but it was delay well be-

yond the contract delivery dates. That the Government was not free from error does not mean it had to wait indefinitely for the sets. True, the rubber company was ever-closer approaching success when the contract was terminated, adding a hint of melodrama to the case, but solicitude for the plight of the contractor alone should not act to deprive the Government of unambiguous contract rights.

The contractor's nonperformance was excusable, but it is a rare situation, indeed, where excusable nonperformance can be equated with full performance. Certainly the facts permit no such equation here. The contractor did *not* perform but should not be subjected to the liability of a default; neither should such liability be rested on the Government.

Subsection 11(e) of the contract states that when, as here, a Notice of Default is deemed to have been issued pursuant to the clause of the contract entitled "Termination for Convenience of the Government", the rights and obligations of the parties to the contract shall in such event be governed by that clause. Accordingly, the contractor ought to recover the sum of his costs, $69,347.33; a profit (6 percent of costs), $4,160.84; settlement expenses, $729.00; less partial payments received, $16,052.01; totaling a net amount of $58,185.16. I believe that this is the full amount allowable to plaintiff regardless of whether the matter is treated as a breach of contract or otherwise. I can find no just ground for adding any additional amount.

Findings of Fact

The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:

\* \* \* \* \* \*

2. On June 27, 1951, Beam and defendant, acting through the United States Army Corps of Engineers, Philadelphia District, entered into Department of Defense Negotiated Contract No. DA 36–109–ENG–955 (referred to hereinafter as contract 955). Under this contract Beam agreed to deliver to defendant 500 No. 2, 1½ kw electric lighting equipment sets at a price of $925 for each set, delivery to commence on or before November 20, 1951, and to be completed by February 21, 1952, plus 500 No. 4, 5 kw electric lighting equipment sets at a price of $2,425 for each set, delivery to commence on or before November 20, 1951, and to be completed by April 22, 1952. The total contract price was $1,-675,000. Among the terms of the contract were the following provisions:

"Partial Payments

"Partial payments, which are hereby defined as payments prior to delivery, on work in progress for the Government under this contract, may be made upon the following terms and conditions.

"(a) The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: Provided, that such partial payments shall not exceed 75 percent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer: Provided further, that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated advance payments if any, made under this contract, exceed 80 percent of the total contract price of supplies still to be delivered.

"(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisi-

tion or production: Provided, that nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract.

"(c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained.

"(d) It is recognized that property (including, without limitation, completed supplies, spare parts, drawings, information, partially completed supplies, work in process, materials, fabricated parts and other things called for herein) title to which is or may hereafter become vested in the Government pursuant to this clause will from time to time be used by or put in the care, custody or possession of the Contractor in connection with the performance of this contract. The Contractor, either before or after receipt of notice of termination at the option of the Government, may acquire or dispose of property to which title is vested in the Government under this clause, upon terms approved by the Contracting Officer: Provided, that after receipt of notice of termination, any such property that is a part of termination inventory may be acquired or disposed of only in accordance with the provisions of the clause of this contract entitled Termination for Convenience of the Government and applicable laws and regulations. The agreed price (in case of acquisition by the Contractor) or the proceeds received by the Contractor (in case of any other disposition), shall, to the extent that such price and proceeds do not exceed the unliquidated balance of partial payments hereunder, be paid or credited to the Government as the Contracting Officer shall direct; and such unliquidated balance shall be reduced accordingly. Current production scrap may be sold by the Contractor without approval of the Contracting Officer but the proceeds will be applied as provided in this paragraph (d), provided, that any such scrap which is a part of termination inventory may be sold only in accordance with the provisions of the Termination for Convenience of the Government of this contract and applicable laws and regulations. Upon liquidation of all partial payments hereunder or upon completion of deliveries called for by this contract, title to all property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this clause shall vest in the Contractor. Under General Provisions were the following:

"5. Inspection

"(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.

* * * * * *

"(c) * * * All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. * * *

"11. Default

"(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as

to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

"(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

"(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, *Provided*, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

"(d) If this contract is terminated as provided in paragraph (a) of this clause, the Government, in addition to any other rights provided in this clause, may require the Contractor to transfer title and deliver to the Government, in the manner and to the extent directed by the Contracting Officer, (i) any completed supplies, and (ii) such partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights (hereinafter called 'manufacturing materials') as the Contractor has specifically produced or specifically acquired for the performance of such part of this contract as has been terminated; and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in possession of the Contractor in which the Government has an interest. The Government shall pay to the Contractor the contract price for completed supplies delivered to and accepted by the Government, and the amount agreed upon by the Contractor and the Contracting Officer for manufacturing materials delivered to and accepted by the Government and for the protection and preservation of property. Failure to agree shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Dispute."

"(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled 'Termination for Convenience of the Government,' and the rights and obligations of the parties hereto shall in such event be governed by such clause. (*Except as otherwise provided in this contract, this paragraph (e) applies only if this contract is with a military department.*)

"(f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

"12. Disputes

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement

shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: *Provided*, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

\* \* \* \* \* \*

"21. Termination for Convenience of the Government

"(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

"(b) After receipt of a Notice of Termination, and except as otherwise directed by the Contracting Officer, the Contractor shall (1) stop work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services or facilities except as may be necessary for completion of such portion of the work under the contract as is not terminated; (3)

terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the Notice of Termination; (4) assign to the Government, in the manner, at the times, and to the extent directed by the Contracting Officer, all of the right, title and interest of the Contractor under the orders and subcontracts so terminated; (5) settle all claims arising out of such termination of orders and subcontracts, subject to the approval or ratification of the Contracting Officer, which approval or ratification shall be final for all the purposes of this clause; (6) transfer title and deliver to the Government, in the manner, at the times, and to the extent, if any, directed by the Contracting Officer, (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced as a part of, or acquired in connection with the performance of the work terminated by the Notice of Termination, and (ii) the completed or partially completed plans, drawings, information, and other property which, if the contract had been completed, would have been required to be furnished to the Government; (7) use its best efforts to sell, in the manner, at the times, to the extent, and at the price or prices directed or authorized by the Contracting Officer, any property of the types referred to in provision (6) of this paragraph, Provided, However, that the Contractor (i) shall not be required to extend credit to any purchaser, and (ii) may keep any such property at a price or prices approved by the Contracting Officer; and provided further that the proceeds of any such transfer or disposition shall be applied in reduction of any payments to be made by the Government to the Contractor under this contract or shall otherwise be credited to the price or cost of the work covered by this contract or paid in such other manner as the Contracting Officer may direct; (8) complete performance or such part of the work as shall not have been terminated by the Notice of Termination; and (9) take such action as may be necessary, or as the Contracting Officer

may direct, for the protection and preservation of the property related to this contract which is in the possession of the Contractor and in which the Government has or may acquire an interest.

"(c) After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer its termination claim, in the form prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than one year from the effective date of termination, unless one or more extensions in writing are granted by the Contracting Officer upon request of the Contractor made in writing within such one year period or authorized extension thereof. Upon failure of the Contractor to submit its termination claim within the time allowed the Contracting Officer shall determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination.

"(d) Subject to the provisions of paragraph (c), the Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this clause, which amount or amounts may include a reasonable allowance for profit, but only on work done in connection with the terminated portion of the contract. The contract shall be amended accordingly, and the Contractor shall be paid the agreed amount. Such amendment shall be final and conclusive upon the Contractor and the Government. Nothing in paragraph (e) of this clause, prescribing the amount to be paid to the Contractor in the event of a failure of the Contractor and the Contracting Officer to agree upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, shall be deemed to limit, restrict, or otherwise determine or affect the amount or amounts which may be agreed upon to be paid to the Contractor pursuant to this paragraph (d).

"(e) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph (d) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (d), shall pay to the Contractor the amounts determined as follows:

"(1) For completed supplies accepted by the Government and not theretofore paid for, a sum equivalent to the aggregate price for such supplies computed in accordance with the price or prices specified in the contract, appropriately adjusted for any saving of freight or other charges;

"(2) The total of—

"(i) the costs incurred in the performance of the work terminated, exclusive of any costs attributable to supplies paid or to be paid for under paragraph (e) (1) hereof.

"(ii) The cost (which may include a reasonable allowance for profit to subcontractors or vendors, but only on work done in connection with the terminated portion of any subcontract or order) of settling and paying claims arising out of the termination of work under subcontracts or orders, as provided in paragraph (b) (5) above, which are properly chargeable to the terminated portion of the contract (exclusive of amounts paid or payable on account of supplies or materials delivered or services furnished by subcontractors or vendors prior to the effective date of the Notice of Termination, which amounts should be included in the costs payable under (i) above), provided that—

"(A) Each such claim has been settled with the written approval of the Contracting Officer; or

"(B) If a final judgment has been rendered against the Contractor, or a subcontractor or vendor, by a court of competent jurisdiction determining the liability of the Contractor, subcontractor, or vendor with respect to any such claim,

the Contracting Officer has determined that such judgment or a part thereof is allocable to the terminated portion of the contract.

"(In order for a judgment to be allowable under this Sub-paragraph (ii), the Contractor, or subcontractor or vendor concerned, must have given the Contracting Officer prompt notice of the initiation of the proceedings in which such judgment was rendered and offered in writing to give the Government complete control of the defense of the proceedings, and must have diligently defended the suit; or, if the Government has assumed control of the defense of the proceedings, must have rendered such reasonable assistance as has been requested by the Government. If such judgment includes amounts for loss of anticipatory profits or consequential damages, such amounts will not be allowable under this subparagraph.)

"(iii) a sum equal to 2% of that part of the amount determined under (i) which represents the cost of articles and materials not processed by the Contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under (i) above.

"(3) The reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of termination inventory.

"The total sum to be paid to the Contractor under (1) and (2) of this paragraph (e) shall not exceed the total contract price as reduced by the amount of payments otherwise made and as further reduced by the contract price of work not terminated. Except for normal spoilage, and except to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraph (e) (1) and paragraph (e) (2) (i), any amounts allocable to or payable in connection with property which is destroyed, lost, stolen, or damaged so as to become undeliverable to the Government, or to a buyer pursuant to paragraph (b) (7).

"(f) The Contractor shall have the right of appeal, under the clause of this contract entitled 'Disputes', from any determination of the amount due to the Contractor, made by the Contracting Officer under paragraphs (c) or (e) above, except that if the Contractor has failed to submit its claim within the time provided in paragraph (c) above and has failed to request extension of such time, he shall have no such right of appeal. In any case where the Contracting Officer has made a determination of the amount due under paragraph (c) or (e) above, the Government shall pay to the Contractor the following: (i) if there is no right of appeal hereunder or if no timely appeal has been taken, the amount so determined by the Contracting Officer, or (ii) if an appeal has been taken, the amount finally determined on such appeal; any such determination being final and conclusive upon the Contractor and the Government.

"(g) In arriving at the amount due the contractor under this clause there shall be deducted (1) all unliquidated advance or other unliquidated payments on account theretofore made to the Contractor, (2) any claim which the Government may have against the Contractor in connection with this contract, and (3) the agreed price for, or the proceeds of sale of, any materials, supplies or other things kept by the Contractor or sold, pursuant to the provisions of this clause, and not otherwise recovered by or credited to the Government.

"(h) If the termination hereunder be partial, prior to the settlement of the terminated portion of this contract, the

Contractor may file with the Contracting Officer a request in writing for an equitable adjustment of the price or prices specified in the contract relating to the continued portion of the contract (the portion not terminated by the Notice of Termination), and such equitable adjustment as may be agreed upon shall be made in such price or prices.

"(i) The Government may from time to time, under such terms and conditions as it may prescribe, make partial payments and payments on account against costs incurred by the Contractor in connection with the terminated portion of this contract whenever in the opinion of the Contracting Officer the aggregate of such payments shall be within the amount to which the Contractor will be entitled hereunder. If the total of such payments is in excess of the amount finally agreed or determined to be due under this clause, such excess shall be payable by the Contractor to the Government upon demand, together with interest computed at the rate of 6% per annum, for the period from the date such excess payment is received by the Contractor to the date on which such excess is repaid to the Government.

"(j) Any determination of costs under paragraph (c) or (e) hereof shall be governed by the Cost Principles set forth in Section XV of the Armed Services Procurement Regulation, as in effect on the date of this contract.

"(k) Unless otherwise provided for in this contract, or by applicable statute, the Contractor, from the effective date of termination and for a period of three years after final settlement under this contract, shall preserve and make available to the Government at all reasonable times at the office of the Contractor but without expense to the Government, all its books, records, documents, and other evidence bearing on the costs and expenses of the Contractor under this contract and relating to the work terminated hereunder, or, to the extent approved by the Contracting Officer, photographs, microphotographs, or other authentic reproductions thereof. * * *"